UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| VOLM COMPANIES, INCORPORATED, a Wisconsin Corporation, and PLASPACK U.S.A., INC., a Wisconsin Corporation, <br><br>Plaintiffs, <br><br>v. <br><br>MARK' ANDY, INC. a Missouri Corporation, <br><br>Defendant. | Case No. <br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiffs, Volm Companies, Incorporated, and Plaspack, U.S.A., Inc., by their undersigned counsel, and for their claims for relief against Defendant Mark' Andy, Inc., aver and state as follows:

### PARTIES

1.  Plaintiff Volm Companies, Incorporated ("Volm Companies"), is a Wisconsin corporation and is located and has its principal place of business in Antigo, Wisconsin. Volm Companies is thus a citizen of the State of Wisconsin for purposes of diversity jurisdiction herein.

1

2. Plaintiff Plaspack U.S.A., Inc. ("Plaspack"), is a Wisconsin corporation and is located and has its principal place of business in Antigo, Wisconsin. Plaspack is thus a citizen of the State of Wisconsin for purposes of diversity jurisdiction.

3. Defendant Mark' Andy, Inc. ("Mark Andy") is a Missouri corporation and is located and has its principal place of business in Chesterfield, Missouri. Mark Andy is thus a citizen of Missouri for purposes of diversity jurisdiction herein.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction herein under 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5. The Court has *in personam* jurisdiction over Mark Andy in that its principal place of business is in the State of Missouri and it transacts and has transacted business, including entering into the subject agreement, in the State of Missouri.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Mark Andy resides in this District.

## THE VOLM COMPANIES AND PLASPACK

7. Although it started as a small family-run business in 1954, Volm Companies' longstanding dedication to outstanding customer service and innovative product solutions has brought it widespread acclaim and success in the ever-expanding and changing markets it serves. Through its offices in northern Wisconsin and in a number of other states, Volm Companies has become a leading source for packaging and equipment solutions for a wide variety of items,

including potatoes, onions, citrus, other produce, frozen fruits and vegetables, and lawn and garden applications throughout the United States and in many foreign countries.

8. Plaspack is a plastics manufacturer that makes bags, labels and other plastics products for Volm Companies and its customers. At all times material, Plaspack has been a wholly-owned subsidiary of Volm Companies.

## PURCHASE OF THE VERSA MAX CONVERTING SYSTEM

9. In order to meet growing present and anticipated future customer demand for better and more innovative packaging print work, Volm Companies, in association with Plaspack (hereinafter referred to collectively as "Plaintiffs"), sought better printing capability by acquiring a new press that could accommodate its expanding business opportunities. Plaintiffs consulted with and were solicited by Mark Andy, which advised that it could provide Plaintiffs with the print capabilities they were seeking.

10. On March 22, 2016, Plaintiffs, for their shared and respective benefits, entered into a Purchase Agreement with Mark Andy of more than $3 million to provide a custom-built press, known as a custom Model Versa Max 28", 10 Color Converting System (the "Press").

11. Plaintiffs' specific requirements, incorporated in the explicit terms of the Purchase Agreement, call for a press that, among other requirements, has the ability to print up to ten (10) colors on multiple substrates with three different ink systems to a level of quality generally accepted in the flexographic printing industry. Plaintiffs insisted on these requirements to satisfy not only the present needs of their existing customer base, but also to allow Plaintiffs to pursue new and expanding business opportunities and customers, in areas such as environmental sustainability, where Plaintiffs are an emerging leader.

**DELAYED PRESS INSTALLATION AND RESOLUTION OF DELAY**

12. Mark Andy promised Plaintiffs that the Press would be delivered and be fully operational by November 2016, but there were months of improper delays in Mark Andy's production and installation of its new Press in Plaintiffs' facilities in Wisconsin. Although Plaintiffs purchased the machine in 2016, it was not installed and made even partially operational by Mark Andy until April 2017.

13. Because the Press became only partially operational more than a year after the Purchase Agreement was signed, Plaintiffs requested and received from Mark Andy a small partial credit of $133,000.00 against the purchase price for the Press, which exceeded $3 million.

**IMMEDIATE PROBLEMS WITH PRESS PERFORMANCE
AND NONPERFORMANCE**

14. Since Mark Andy's purported "completion" of its installation months later, the Press suffered fundamental problems and serious and critical performance difficulties, almost all of which still persist, including:

    A.    Inability to hold registration (the accurate printing of one color next to another to create an acceptable design printed material) to agreed standards, with wavering and inconsistent registration a persistent problem with the Press, defeating Plaintiffs' ability to meet customer needs as it expected.

    B.    Defects in:

        i.    tension regulation (the force used to control precise material flow through the Press).

        ii.    unwinding equipment (used to unwind a roll of film or paper substrate in a controlled way to feed the press); and

        iii.    and safety control (shutting down the machine for phantom reasons).

      C.      Missing colors due to inoperable or malfunctioning print decks;

      D.      Repeated ghost faults (actions taken by the Press without an operator or known cause);

      E.      Servo motor faults in parts that drive machine performance;

      F.      Power supply malfunctions;

      G.      Start-up sequence malfunctions;

      H.      Splice and web-break detection failures;

      I.      Deficient electrical wiring and cord design;

      J.      Improper installation of components and defective assembly impacting Press performance; and

      K.      Excessive unexpected product waste while running jobs.

**MARK ANDY'S REPEATED INSUFFICIENT AND FAILED EFFORTS
TO REMEDY PROBLEMS AND DEFICIENCIES WITH THE PRESS**

15.    At Plaintiffs' request, Mark Andy initiated efforts to repair and remediate the Press and make it function to agreed standards of performance. Those efforts, over several years, have included hundreds of emails, attempted remote software adjustments and conversations between Plaintiffs and Mark Andy, as well as a number of site visits in Antigo to repair and redesign the Press.

16.    Mark Andy's repair and redesign trips to Antigo took place, among other times, in December 2017, August and September 2018, October and November 2019, January, June and August 2020, January, August and September 2021, and January 2022.  Some of those site visits involved several days of efforts by Mark Andy personnel to correct performance, which created substantial down time in Plaintiffs' utilization of the Press.  Plaintiffs allowed Mark Andy to undertake so many repair and redesign visits and efforts because Mark Andy repeatedly assured

5

Plaintiffs that the Press could be made to function to the specifications set forth in the Purchase Agreement.  Were it not for all the assurances on which Plaintiffs were asked to rely, Plaintiffs would have insisted that Mark Andy replace the Press or return the purchase proceeds immediately.

17.    As fundamental problems with the Press and its performance continued into 2019, Plaintiffs requested that Mark Andy refund the purchase price for the Press or replace it.  However, Mark Andy rejected all Plaintiffs' tender offers of the Press and replacement requests.

18.    Mark Andy later made some improvement to the start-up sequence and safety faults problems, but the many other key fundamental deficiencies in performance of the Press nevertheless persisted and Plaintiffs have documented (in exhaustive detail) the continued problems.

**2020 WORK PLAN AGREEMENT**

19.    In June 2020, Plaintiffs and Mark Andy entered into an agreement to achieve the defined and specific performance standards for tension control and associated print registration, elimination of electrical ghost faults, and general machine-build issues. Mark Andy committed to bringing the Press performance to, among other stated requirements, agreed registration standards.

20.    Despite Plaintiffs providing Mark Andy many additional weeks (to January 2021) to meet the performance standards that Mark Andy itself proposed, the problems with the Press only worsened, and Mark Andy's own engineers conceded to Plaintiffs that they could not meet the key 2020 Work Plan Agreement standards.

21.    In February 2021, Plaintiffs once again called on Mark Andy to refund the purchase price of the Press, but Mark Andy declined their tender of the Press for return and asked Plaintiffs to lower the agreed performance standards of the June 2020 Work Plan Agreement, which Plaintiffs refused to do.

22.     Plaintiffs provided Mark Andy all reasonable opportunities to continue its work efforts to reach the agreed standards -- including further Mark Andy visits to Antigo in August 2021 for promised comprehensive and full evaluation and work on the Press -- but Mark Andy failed to achieve them, rendering the agreement by its terms null and void, and therefore any and all stated warranties failed of their essential purposes.

### MARK ANDY'S CONTINUED INABILITY TO PROVIDE PLAINTIFFS WITH A PROPERLY WORKING PRESS

23.     It is evident, after all Mark Andy's failed efforts to repair and redesign much of the Press during on-site visits, that the performance issues of the Press originate with its improper design (although by no means is design the sole significant problem).

24.     Mark Andy has conceded the Press was a "prototype" designed to address the particular needs of Plaintiffs and Plaintiffs' present and future customer base. But the Press turned out to be a *failed* prototype:  The Press does not meet Plaintiffs' contract requirements or satisfy basic industry standards.

25.     Aside from Mark Andy's many pleas that Plaintiff needed to afford Mark Andy opportunity after opportunity to fix the problems (and assurance after assurance by Mark Andy that the fundamental problems could be fixed), all of which are well detailed and documented, Mark Andy management has failed to come to grips with the fact the Press cannot be fixed, even though Mark Andy's own appointed engineers advised Plaintiffs it cannot be.  Mark Andy even forbade its engineers from sharing (at Plaintiffs' request) relevant performance data regarding the Press that they collected during their visits to Antigo.

26.     The Press Mark Andy designed and manufactured simply cannot satisfy even the basic standards the Purchase Agreement requires regardless of the number of repair and redesign efforts and different personnel teams Mark Andy utilizes to work on the Press.

7

27. As late as this year, Mark Andy has also declined to provide Plaintiffs, as they requested, assurances that the Press can be brought into conformance with the material and essential standards set forth in the Purchase Agreement.

**THE HARMS AND DAMAGES PLAINTIFFS HAVE SUFFERED TO DATE**

28. The harms to Plaintiffs' business resulting from long-standing operational failures of the Press have been profound. Those damages, which continue to mount include:

    A. Unacceptable print product;

    B. Product rejections and the need to issue credits to customers (particularly for Plaintiffs' main customers in the potato and other produce areas);

    C. Lost business opportunities due to the inability to pursue projects for customers because Plaintiffs cannot meet customer specifications and volumes;

    D. Payment of the substantial costs of contracting with third parties to perform print work that Plaintiffs cannot accomplish with the Press;

    E. Injury to its business growth as new packaging demand requiring high-level print work increases (including in the areas of environmentally sustainable products, frozen foods and lawn and garden);

    F. The extreme expense of wasted product due to unacceptable print generated by the Press, with excessive unexpected waste on virtually all production job runs since the Press was installed;

    G. Down time in Press usage due to Press problems;

    H. Inability to run a third shift of workers (which Plaintiffs expressly expected to do when the Press was purchased);

    I.  Extensive employee time spent troubleshooting the Press and attempting to obtain and salvage print work, because, in general, every print run on the Press produces excessive waste and inferior quality graphics that need to be addressed; and

    J.  Loss of goodwill and harm to Plaintiffs' business reputation built over 68 years.

  29.  Among other specific harms that have caused Plaintiffs to suffer millions of dollars in damages:

    A.  Plaintiffs have had to purchase many millions of labels for customers because the Press was not able to print them internally;

    B.  Plaintiffs have declined multiple-year contracts for companies needing packaging labels;

    C.  Plaintiffs have lost hundreds of thousands of dollars in annual business because it cannot print a popular style label for netting bags;

    D.  The Press cannot run a Half-and-Half product involving millions of bags and hundreds of thousands of dollars in annual sales;

    E.  Plaintiffs have had to outsource hundreds of millions of "wine glass" labels (a type of label attached to mesh-style bags); and

    F.  Plaintiffs cannot pursue business involving various recyclable products that their customer base has requested in the environmental sustainability product market, a key growth area that Plaintiffs wanted to and would otherwise be poised to capture.  These materials were specifically included in the specifications of the Purchase Agreement and Mark Andy has conceded they cannot be printed on its Press.

30. The stated warranties in the Purchase Agreement fail of their essential purpose and are avoided because Mark Andy, despite numerous promises and attempts to repair or remedy the defects in the Press, failed to correct those defects, provide a new conforming Press, or furnish other reasonable, acceptable accommodation within a reasonable period of time.

## TOLLING AGREEMENTS

31. In order to accommodate Mark Andy's repeated representations that it could repair or redesign the Press to meet agreed standards, Plaintiffs and Mark Andy entered into a series of Tolling Agreements that have tolled the statute of limitations from June 5, 2020, through March 31, 2022. Accordingly, and for the reasons set forth above, this action is timely brought in all respects.

## COUNT I
## BREACH OF CONTRACT

32. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 31 above.

33. Due to its repeated failures to provide Plaintiffs with a properly functioning press, Mark Andy has materially breached the Purchase Agreement.

34. Further, despite due and proper demand, Mark Andy refuses to honor Plaintiffs' request for return of the monies it paid for the Press or provide any other necessary and suitable remedy.

35. As a direct and proximate result of Mark Andy's breach of contract, Plaintiffs have suffered damages in an amount to be determined at trial but believed to be in excess of $8 million.

36. Plaintiffs have fully performed and paid Mark Andy in accordance with the Purchase Agreement, have provided Mark Andy numerous opportunities to make the Press workable, and performed any and all conditions precedent to their right of recovery hereunder.

## COUNT II
## BREACH OF CONVENANT OF GOOD FAITH AND FAIR DEALING

37. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 36 above.

38. Missouri law assumes an implied covenant of good faith and fair dealing in all contracts.

39. Mark Andy has breached its covenant of good faith and fair dealing by virtue of the conduct and omissions described above, including by manufacturing, delivering and installing a "prototype" Press that Mark Andy had no good faith basis to believe would be able to perform in accordance with the Purchase Agreement, and by repeatedly assuring Plaintiffs that the Press could be fixed when, in fact, Mark Andy had no good faith basis to believe the Press could be repaired or redesigned onsite to perform in accordance with the Purchase Agreement.

40. As a direct and proximate result of Mark Andy's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF EXPRESS WARRANTY

41. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 40 above.

42. When Mark Andy sold Plaintiffs the Press, it expressly warranted in the Purchase Agreement that the Press would conform to all the stated and published specifications in the Purchase Agreement, and that the Press would be free from defects in materials and workmanship under normal use and service.

43. This warranty was a material factor inducing Plaintiffs to purchase the Press.

44. The Press provided to Plaintiffs by Mark Andy has never adequately satisfied the warranted specifications.

45. Plaintiffs have timely notified Mark Andy in detail of each of the failures of the Press to satisfy the express warranty.

46. Despite receiving such notices, Mark Andy has failed to provide Plaintiffs with a Press that performs as expressly warranted in the Purchase Agreement, or grant Plaintiffs a reasonable allowance to compensate for Mark Andy's failure to provide a conforming press.

47. As a direct and proximate result of these failures, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

48. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 47 above.

49. Mark Andy is a merchant in the business of selling presses of the nature of the Press that Plaintiffs purchased.

50. At the time Mark Andy provided Plaintiffs with the Press, and at all times since, the Press has not been merchantable or fit for its ordinary purpose for which Plaintiffs are using it as agreed and intended.

51. Plaintiffs have timely notified Mark Andy of the defective nature of the Press and the harm it is causing Plaintiffs.

52. Despite such notices, Mark Andy has failed to provide Plaintiffs with a merchantable Press that performs the functions that were agreed to and intended by the Purchase Agreement.

53. As a direct and proximate result of Mark Andy's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

54. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 53 above.

55. At the time Mark Andy contracted with Plaintiffs for the Press, it knew of the particular purposes for which the Press was required, and that Plaintiffs were relying on Mark Andy's skill and judgment to select and furnish a press that would satisfy such purposes.

56. Mark Andy breached such warranty by failing to provide Plaintiffs with a press that satisfied the requirements and purposes that were agreed to and intended by the Purchase Agreement.

57. Plaintiffs have timely notified Mark Andy of the defective nature of the Press and the harm it is causing Plaintiffs.

58. Despite such notices, Mark Andy has failed to provide Plaintiffs with a press that is fit for the agreed and intended purposes set forth in the Purchase Agreement.

59. As the direct and proximate result of Mark Andy's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiffs, Volm Companies, Incorporated and Plaspack U.S.A., Inc., pray for judgment in their favor against Defendant Mark' Andy, Inc., as follows:

A. Rescission of the Purchase Agreement and return of all monies paid, with interest from the date of payment;

B. For compensatory, consequential and incidental damages in an amount to be determined at trial, but presently believed to exceed $8 million;

C. For prejudgment interest in the full amount permitted by law;

13

D. For their expenses, costs, disbursements and actual reasonable attorneys' fees in this action; and

E. For such other and further relief as the Court deems just and proper in the premises.

## JURY DEMAND

PLAINTIFF VOLM COMPANIES, INCORPORATED, AND PLASPACK U.S.A., INC., hereby demand trial by jury on all claims so triable by a jury.

Dated this 31st day of March, 2022.

                                        Respectfully submitted,

By:   /s/Jeffrey B. Hunt
       Jeffrey B. Hunt, 33349MO
       Rosenblum Goldenhersh, P.C.
       7733 Forsyth Blvd., Ste. 400
       St. Louis, MO 63105
       Telephone:  (314) 726-6868
       Facsimile: (314) 726-6786
       Email:  jhunt@rosenblumgoldenhersh.com

       *Attorneys for Plaintiffs, Volm Companies, Incorporated, and Plaspack U.S.A., Inc.*

***Co-Counsel: pro hac vice motions to be filed:***
Robert L. Gegios and Lance E. Duroni
Kohner, Mann & Kailas, S.C.
4650 N. Port Washington Road
Washington Building, 2nd Floor
Milwaukee, WI 53212-1059
Telephone: (414) 962-5110
Facsimile: (414) 962-8725
Email: rgegios@kmksc.com
       lduroni@kmksc.com